944 F.2d 503
 6 IER Cases 1324
 AFGE LOCAL 1533, Pearl G. Ruchman, Charles Coates, Elaine
Posey, AFGE, AFL-CIO; National Federation of Federal
Employees (NFFE), and the National Federation of Federal
Employees Local 795; Metal Trades Department, AFL-CIO, Plaintiffs,
and
International Federation of Professional and Technical
Engineers (IFPTE), AFL-CIO and CLC, Intervenor-Appellant,
v.
Richard B. CHENEY, Secretary of Department of Defense, et
al.; H. Lawrence Garrett, III, Secretary of the
Navy, et al., Defendants-Appellees.
 No. 90-15834.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 13, 1991.
Decided Sept. 10, 1991.
 
 Julia L. Akins, IFPTE, AFL-CIO, Silver Spring, Md., for intervenor-appellant.
 Lowell V. Sturgill, Civ. Div., Dept. of Justice, Washington, D.C., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before BRUNETTI, KOZINSKI and RYMER, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 Once again we consider the constitutionality of a government-sponsored drug testing program, this time the Department of the Navy's random drug testing of civilian employees who hold Top Secret with Access (TSA) security clearances.
 
 Facts
 
 2
 There is relatively little dispute over the facts. On June 30, 1989, the Navy issued Civilian Personnel Instruction 792-3 outlining a drug testing plan for its civilian employees. Under the plan, the testing is conducted in accordance with the "Mandatory Guidelines for Federal Workplace Drug Testing Programs," 53 Fed.Reg. 11,970 (Apr. 11, 1988), and is administered by qualified medical personnel. The results of the tests are strictly confidential. See Office of Civilian Personnel Management (OCPM) Instruction 12792.3, § 18(a) & (b), at 35-36 (June 30, 1989).
 
 
 3
 The plan requires that all Navy civilian employees holding TSA security clearances submit to random drug testing. Civilian employees are required to hold TSA clearances if they have "access"[1] to top secret information of the United States. Top secret information is defined as information "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security." Exec. Order 12356, § 1.1(a)(1), 47 Fed.Reg. 14874, 14874 (1982).
 
 
 4
 To receive a TSA clearance, an employee must undergo an extensive background investigation which includes, at a minimum, a check of the Defense Center Index of Investigations and Federal Bureau of Investigation files, a subject interview and a field investigation. OPNAVINST 5510.1H, ch. 21, at 21-2 to 21-3 (Aug. 24, 1990). Typical elements of the field investigation are employment and credit history checks, employment and character reference interviews, and inquiries to local agencies in areas where the subject lived, worked or went to school. Id. Moreover, to maintain a TSA clearance, an employee is subjected every five years to a security review that covers many of the same areas as the initial background investigation. Id. at 21-3 to 21-4.
 
 
 5
 Appellant in this case, the International Federation of Professional and Technical Engineers (IFPTE), represents a large number of engineers employed by the Navy. The engineers are required to hold TSA clearances and are therefore subject to the Navy's random drug testing program. IFPTE intervened in a suit brought by five other federal civilian employee unions seeking to enjoin the Navy's drug testing program. Shortly after IFPTE intervened, and before it could conduct any discovery, the district court ruled on a motion for summary judgment submitted by the Navy. 754 F.Supp. 1409. The court granted the motion as to the Navy's random drug testing of civilian employees holding TSA clearances, relying heavily on the reasoning in Harmon v. Thornburgh, 878 F.2d 484 (D.C.Cir.1989), cert. denied sub nom. Bell v. Thornburgh, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).[2] From that judgment, only IFPTE appeals.[3]
 
 Discussion
 
 6
 We review the constitutionality of the Navy's drug testing program de novo. See International Brotherhood of Teamsters v. Department of Transp., 932 F.2d 1292, 1298 (9th Cir.1991). Because this is a facial challenge to the Navy's program, we assume for the purpose of review that the Navy will implement its program with due regard for the constitutional rights of its employees. Thus, "we decide only the narrow question of whether these drug tests 'can ever be conducted' without offending the fourth amendment." Id. at 1298 (quoting Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 632-33 n. 10, 109 S.Ct. 1402, 1421 n. 10, 103 L.Ed.2d 639 (1989)).[4]
 
 
 7
 * IFPTE's principal argument is that the Navy failed to provide adequate justification for subjecting IFPTE members who hold TSA clearances to random drug tests because those members are never actually allowed to see or handle top secret information. To support its argument, IFPTE presents a series of declarations from its members alleging that "[t]hey were required to obtain top secret clearance with access to classified material solely for the purpose of allowing them to perform intermittent duties in restricted areas where classified materials are maintained." Wright declaration at 2; Landry declaration at 2-3. The declarants claim that IFPTE members seldom, if ever, are exposed to top secret information and that they may not even be present while classified information is being handled by military personnel. Landry declaration at 3; Cox declaration at 3.[5] According to appellant, then, the government has not met--and cannot meet--the principal requirement of National Treasury Employees Union v. Von Raab, 489 U.S. 656, 678, 109 S.Ct. 1384, 1397, 103 L.Ed.2d 685 (1989), that the employees in question be "likely to gain access to sensitive information."
 
 
 8
 IFPTE's argument proves too much, however, as it calls into question the Navy's very determination that IFPTE members must hold TSA clearances as a condition of employment. Were the declarations of the various IFPTE members accepted at face value, one would have to conclude that there is no reason for IFPTE members to hold security clearances at all, as they will never be allowed anywhere near classified information. Yet the Navy has defined the term "access" broadly to encompass not only those situations where an employee actually handles classified information, but also where an employee is "in a place where such information is kept, if the security measures which are in effect do not prevent him or her from gaining knowledge or possession of classified information." See note 1 supra.
 
 
 9
 By requiring that IFPTE members hold TSA clearances as a condition of employment, the Navy has determined that their jobs will bring them close enough to top secret information that they cannot always be prevented from gaining knowledge or possession thereof. Significantly, IFPTE "does not challenge the grant of security clearances to its members." Appellant's Reply Brief at 14. It is therefore bound by the Navy's determination that these employees work in close enough proximity to classified information that there is a material risk they will gain control over it.
 
 
 10
 Where a drug testing requirement is a concomitant to maintaining a security clearance which allows its holder closer access to classified information than those who do not have such a clearance, Von Raab 's requirement that the individual be "likely to gain access to sensitive information" is perforce satisfied. Von Raab, 489 U.S. at 678, 109 S.Ct. at 1397. The drug testing requirement is one of several safeguards the Navy uses to maintain the integrity of TSA clearances.[6] We reject appellant's invitation to second-guess which holders of security clearances actually have access to classified information and which do not. Holding the security clearance provides access enough. Like the District of Columbia Circuit, we conclude that "[t]he frequency of exposure to secret documents (or lack of it) is not crucial." Hartness, 919 F.2d at 173. "[A] person with a top secret clearance generates sufficiently grave potential risk to national security to make the decision to conduct random urinalysis testing reasonable regardless of any other attendant circumstances." Id. at 172 (emphasis in original).[7]
 
 
 11
 Our conclusion is supported by the diminished privacy expectations of TSA clearance holders. To obtain and maintain TSA clearances, these individuals are subjected to detailed investigations into their private lives which occur both as a condition for obtaining TSA clearances and periodically thereafter. See page 505 supra. Individuals who accept jobs that subject them to such close review of their personal lives cannot legitimately claim to have a high expectation of job-related privacy. Moreover, the Supreme Court has approved the same drug testing procedures used by the Navy, finding that they "significantly minimize the program's intrusion on privacy." Von Raab, 489 U.S. at 672 n. 2, 109 S.Ct. at 1394 n. 2. Thus, the incremental intrusion caused by being subjected to random drug testing under these procedures, over and above the privacy intrusion involved in obtaining a TSA clearance, is relatively small.[8]
 
 II
 
 12
 IFPTE also argues that if the Navy is allowed to test IFPTE members on the basis of TSA clearances alone, then a reviewing court must ensure that the Navy's drug testing program is in fact designed to protect national security, i.e., that there is a nexus between national security and the Navy's testing program. To support its claim of inadequate nexus, IFPTE first points out that testing positive does not automatically lead to a revocation of an employee's TSA clearance. While IFPTE is correct in this observation, it fails to take into account how the Navy's disciplinary scheme in fact operates to protect national security. The applicable regulations provide the following mandatory consequences of a finding that the employee has engaged in illegal drug use:
 
 
 13
 (a) If the employee occupies a sensitive position [which includes positions requiring TSA clearance], ... the employee must immediately be removed from the position through appropriate personnel action. The employee will be assigned to a non-sensitive position, if available.
 
 
 14
 (b) The activity head/commander may return the employee to duty in a sensitive position as part of a rehabilitation and counseling program, if it would not endanger public health, safety or national security. This determination should consider information obtained from the activity/command [Drug Program Coordinator], the [Medical Review Officer], CEAP personnel and the employee's supervisors.
 
 
 15
 OCPM Instruction 12792.3, § 16(a)(2), at 33 (emphasis added). Thus, even if a positive test result does not lead to automatic revocation of an employee's TSA clearance, there is plainly a nexus between a positive test result and the Navy's interest in protecting top secret information, for a positive test result leads to immediate removal from any position that requires a TSA clearance. While the security clearance is not formally revoked, the employee who tests positive is treated as if he did not have a security clearance. See also OPNAVINST 5510.1H, ch. 24, at 24-10 (allowing the limitation or suspension of an individual's access clearance "[w]hen questionable or unfavorable information becomes available concerning [the] individual").
 
 
 16
 IFPTE also seeks support for its inadequate nexus argument from the fact that the Navy's drug testing regulations are separate from its national security regulations and were implemented under the auspices of Executive Order No. 12564 (requiring a drug-free federal work force) instead of an Executive Order on national security. We are unsure what sinister inference IFPTE would have us draw from all this. The Navy's random drug testing program for TSA clearance holders is only one part of a larger drug testing scheme adopted by the Navy. It makes bureaucratic sense to group the Navy's drug testing regulations, all of which were adopted as a package pursuant to Executive Order No. 12564. Furthermore, Executive Order No. 12564 itself invokes the need to protect national security via a drug testing program; the Order specifically requires testing "for the use of illegal drugs by employees in sensitive positions." Exec. Order No. 12564, § 3(a), 53 Fed.Reg. 32889, 32890 (1986). No greater nexus is needed.
 
 III
 
 17
 Finally, IFPTE argues that local Navy commanders who are charged with designating those employees who must have security clearances may be able to manipulate this process in order to sweep large numbers of employees into the drug testing program. Because the decision to grant or deny a security clearance is judicially unreviewable, see Dorfmont v. Brown, 913 F.2d 1399, 1401-04 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991), IFPTE claims that the potential for such abuses by Navy commanders renders the system constitutionally infirm.
 
 
 18
 IFPTE's concerns might be valid if Navy commanders had unbridled discretion in designating employees for security clearances, but they do not. The Navy has in place a series of important procedural safeguards designed to thwart any efforts by local Navy commanders to misuse the security clearance system. First, Navy regulations provide that Navy commanders who initiate unnecessary requests for TSA clearances can be subject to "punitive action" and "administrative sanctions." See OPNAVINST 5510.1H, ch. 4, at 4-1 to 4-2. Moreover, an employee who is wrongfully required to hold a TSA clearance can bring this violation to the attention of a superior commanding officer or the Navy's investigative service for corrective action. See id., ch. 4, at 4-2 to 4-11. Even if the employee does not realize that he is unnecessarily required to hold a TSA clearance, the commander requiring such clearance will not escape scrutiny, as his personnel security program is always subject to inspection and review, see id., ch. 2, at 2-16, and he must report annually on the number of TSA clearances he has required for the civilian workers in his employ. See id., ch. 20, at 20-8 to 20-11. In short, there are a host of protections built into the Navy's security program designed to prevent the abuses which IFPTE fears. Thus, IFPTE's challenge fails on this ground as well.
 
 Conclusion
 
 19
 The Navy's random drug testing of civil employees holding TSA clearances directly furthers a compelling interest in protecting the security of our nation by ensuring that employees who come into close proximity to information "the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security" do not use illegal drugs. Exec. Order 12356, § 1.1(a)(1). Accordingly, we hold that the fourth amendment does not prohibit the Navy from randomly testing its civilian employees for drug use if the employees are also required by the Navy to hold security clearances giving them access to classified information. Considerations of other characteristics of the employees' jobs, including the frequency with which the employees are likely to be exposed to classified information, are irrelevant. The judgment of the district court is affirmed.
 
 
 20
 AFFIRMED.
 
 RYMER, Circuit Judge, concurring:
 
 21
 I agree that the judgment of the district court should be affirmed, but I base my decision on narrower grounds than the majority. The majority holds that the fact of holding a top secret security clearance is by itself sufficient to justify drug testing and that it is therefore unnecessary to consider whether the employees in this case are in fact likely to gain access to sensitive material by working in close proximity to such material. Ante at 506-07 & n. 7.
 
 
 22
 I believe the analysis should run in the other direction. If the employees in this case are in fact likely to gain access to sensitive material, then it is unnecessary to consider the broader question of whether the fact of a top secret security clearance is always sufficient to justify drug testing. In this case, the IFPTE employees have access to areas where classified material is kept and transmitted. Although they are not themselves authorized to handle the material and security measures are in place to prevent them from having direct contact with the material, it is certainly possible for the security measures to fail and for the employees to come into contact with sensitive material. Given this security risk, the Navy's drug testing program is justified. Because summary judgment is warranted on the particular facts of this case, I would express no opinion on whether the government's determination that an employee must hold a top secret security clearance will always meet the constitutional requirements that justify drug testing.
 
 
 23
 The majority also makes no distinction between TSA clearances and other levels of security clearances. See, e.g., ante at 506-08 (stating that employees holding "security clearances" have sufficient access to sensitive information to justify drug testing). I would reserve any judgment about the constitutionality of requiring drug testing for holders of other levels of security clearances until the case is presented to us. Many government employees are required to hold security clearances, and the risk involved with other employees at other levels may be substantially different from the risk involved in this case. The actual risk involved should be balanced independently against the intrusiveness of drug testing whenever the question arises.
 
 
 24
 I see no reason to state a more sweeping rule than necessary to cover the facts of this case and therefore decline to join in the reasoning of the majority opinion.
 
 
 
 [1]
 Access is broadly defined by the Navy as:
 the ability and opportunity to obtain knowledge or possession of classified information. An individual may have access to classified information merely by being in a place where such information is kept, if the security measures which are in effect do not prevent him or her from gaining knowledge or possession of classified information.
 OCPM Instruction 12792.3 app. A, at A-1 (emphasis added).
 
 
 [2]
 IFPTE joined this lawsuit in January of 1990 when it learned that the Navy had designated some of its employees for random drug tests. On March 15, 1990, the district court partially granted plaintiff unions' motion for a preliminary injunction and partially granted the Navy's summary judgment motion. Under an agreement between the plaintiffs and the Navy, the Navy is revising its drug testing plan with regard to the enjoined portions of the plan. The revised plan then will be subject to further proceedings before the district court. In the meantime, intervenor IFPTE alone appeals the district court's grant of summary judgment for the Navy as to its random testing of employees holding TSA clearance
 
 
 [3]
 The Navy claims that we do not have jurisdiction over this case because the district court's Rule 54(b) order contains no "express determination that there is no just reason for delay." Fed.R.Civ.P. 54(b). The district court specifically found that the Navy would not be prejudiced by the entry of judgment under 54(b), that IFPTE's claim was "substantially different" from the remaining claims, and that the court had "offered its final analysis regarding [TSA holders], and there is no possibility that [the Navy] will be subject later to the burden of conflicting and changing orders simultaneously emanating from two judicial sources." This is an adequate statement that there is no just reason for delay; Rule 54(b) does not require that the district court use the rule's precise wording
 
 
 [4]
 Should the Navy subsequently operate its drug testing program in a manner inconsistent with the regulatory scheme evaluated by us today, IFPTE will be free to challenge the Navy program as applied
 
 
 [5]
 The declarations are not entirely consistent on this latter point. While most declarants claim that IFPTE members are never present when military personnel handle classified information, one declarant states that "[i]n the rare event that Navy military personnel has difficulty in providing top secret material to the crypto devices, [IFPTE engineers] may be called on for assistance." Wright declaration at 3
 
 
 [6]
 The ways in which users of illegal drugs might put into jeopardy classified information in their possession are too obvious to require much elaboration. For example, the employee may be "induced, perhaps by a blackmailer who is aware of [the] employee's illegal drug use, to disclose the information." Hartness v. Bush, 919 F.2d 170, 172-73 (D.C.Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2890, 115 L.Ed.2d 1055 (1991). The employee also may sell the information to finance his drug purchases, or even mishandle the information as a result of drug-induced diminished capacity
 
 
 [7]
 In light of our conclusion, it is unnecessary to consider the degree to which IFPTE employees could pose a risk to national security by merely working in the vicinity of top secret information. Nonetheless, we note that IFPTE's own declarations demonstrate the risk of disclosure to unauthorized personnel. As already noted, one declarant admits that members are sometimes present while military personnel feed classified information into crypto devices. Wright declaration at 3. It does not require much imagination to posit a situation where military personnel, through inexperience or carelessness, mishandle classified information in such a way that IFPTE members could gain control over it. Another declarant notes that "[i]n the unlikely event top secret traffic is received [while IFPTE members repair equipment], the military personnel ask us to leave the area." Cox declaration at 2. Again, it is possible to posit the situation where military personnel delay giving the departure order or forget to do so altogether. Finally, one of the declarants explains that after the equipment is repaired and tested dockside, "we may be required to go out with the military crew to 'sea trials.' " Id. We cannot begin to guess the ways in which a shipboard visitor could learn information of a sensitive or classified nature during military maneuvers. The Navy's broad definition of access, which allows for the possibility that "security measures which are in effect do not prevent [an employee] from gaining knowledge or possession of classified information," is clearly designed to deal with situations such as these
 
 
 [8]
 IFPTE also claims that because the Navy's program involves random drug testing, it is more intrusive than the "suspicionless" drug tests considered in Von Raab. Thus, IFPTE insists that we must employ a higher standard of constitutionality than that used by the Von Raab Court
 We have previously noted that the fact that drug testing is done randomly adds "some [additional] weight" to the privacy infringement involved in drug testing. Bluestein v. Skinner, 908 F.2d 451, 457 (9th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). However, any increased intrusiveness is easily outweighed by the increased effectiveness of random testing over scheduled testing. See Railway Labor Executives' Ass'n v. Skinner, 934 F.2d 1096, 1099-1100 (9th Cir.1991).