**Phyllis ROMAGUERA, Kim Bonano, and Tammy Gremillon**

v.

**Jon GEGENHEIMER, Clerk of Court, 24th Judicial District Court, ex Officio Recorder of Mortgages and Conveyances, Parish of Jefferson, State of Louisiana, Honorable Edwin Edwards, Governor of the State of Louisiana.**

Civ. A. No. 91–4469 "E".

United States District Court, E.D. Louisiana.

July 27, 1992.

Samuel S. Dalton, Jefferson, La., for plaintiffs.

Haywood Hillyer, New Orleans, La., for defendants.

## ORDER AND REASONS

LIVAUDAIS, District Judge.

Plaintiffs, Phyllis Romaguera, Kim Bonano, and Tammy Gremillon, all employees of the Clerk of Court, 24th Judicial District Court, Parish of Jefferson, State of Louisiana, filed a complaint for declaratory and injunctive relief challenging the constitutionality of the plan of the Clerk of Court to institute drug testing procedures and the constitutionality of Louisiana Revised Statute 49:1001. The plaintiffs requested the issuance of a Temporary Restraining Order and a Preliminary Injunction. The plaintiffs also requested that a class action be certified.

The Court issued a temporary restraining order on December 10, 1991, enjoining and restraining the defendants from implementing the drug testing program until a preliminary injunction hearing could be held. A hearing relative to the issuance of a Preliminary Injunction was held, consolidated for hearing with the trial on the merits of plaintiffs' complaint. The issue of certification of a class action was not reached.

### I.

The parties entered the following stipulations at the commencement of the hearing:

1) Jon Gegenheimer is the duly elected Clerk of Court for the Parish of Jefferson, State of Louisiana.

2) Pursuant to the Laws and Constitution of the State of Louisiana the Clerk of Court has responsibility to hire, fire, and generally supervise the Deputy Clerks of Court within his judicial district.

3) As part of his duties as Clerk of Court, Jon Gegenheimer has sought, and seeks, to implement a Drug Testing Policy within his office.

4) The provisions and parameters of the Drug Testing Policy are set forth in ... documents identified as Statement of Policy on Drug Abuse (dated December 13, 1991), Acknowledgment of Receipt of Policy, Consent and Authorization, Clerk of Court, Parish of Jefferson, Drug Testing Policies and Procedures....

5) The persons who have been determined by Clerk of Court to fall within the categories of either 'Security Sensitive' or 'Safety Sensitive', and hence subject to random drug testing [are] set forth in the Drug Testing Policies and Procedures....

6) The reasons that the said employees have been determined to be either 'Security Sensitive' or 'Safety Sensitive' are set forth in memoranda promulgated by In House Counsel for the Clerk of Court.

7) The Clerk of Court seeks to implement the above described testing procedures, including random testing of the above described personnel in what he contends to be in compliance with the provisions of *LSA–R.S. 49:1015.*

8) The total number of personnel determined by the Clerk's Office to be either 'Security Sensitive' or 'Safety Sensitive' is as of the time of this hearing two hundred eighty-eight (288). The total number of employees of the Clerk's Office is approximately three hundred twenty (320).

\* \* \* \* \* \*

11) The plaintiffs in this action are all current employees of the Clerk of Court's Office for the 24th Judicial District Court and would be covered by the random testing policies sought to be implemented by the Clerk.

Plaintiff in globo Exhibit No. 1, Joint Stipulation.

The Clerk's Office contracted with a laboratory to perform drug screens on urine samples, testing for amphetamines, opiates, cannabinoid (marijuana), cocaine (benzoylecgonine), and phencyclidine (PCP).

Gegenheimer Exhibit 1. The types of drug testing which the Clerk intends to implement include the following:

A. *Pre-employment.* No applicant will be hired who has not passed a drug test.

B. *Post–Accident.* As soon as possible but not later than twelve hours after any accident that causes any substantial injury or damage to persons or property or any near accident that could have caused such injury or damage, drug and alcohol tests will be required of all employees whose performance cannot be completely discounted as a contributing factor of the accident.

C. *Random.* During each twelve-month period commencing December 1, 1991, approximately once every two months, a sufficient number of employees will be randomly selected for drug tests to that, at the end of the twelve months, drug tests will have been given at a rate equal to 100 percent of all employees occupying safety-sensitive or security-sensitive positions; the selection, since it will be random, could result in a particular employee being tested anywhere from six times to not at all during any twelve-month period.

D. *Reasonable suspicion.* When two supervisors (including department heads) agree that there is a reason to suspect that an employee may be using a prohibited drug or may have used alcohol in violation of the policy statement, the employee shall be tested for drug/and or alcohol use. These decisions must be based upon a reasonable belief that the employee has exhibited one or more specific, contemporaneous, physical, behavioral, or performance indicators of probable drug use.

E. *Return-to-duty.* Any employee who has taken an unpaid leave of absence to enter rehabilitation for drug use or alcohol abuse may not return to duty until he or she has passed a drug test and has been cleared for work by a Clerk's Office Medical Review Officer; such employee shall also be subject to unannounced follow-up testing for up to sixty (60) months after return to duty.

Gegenheimer Exhibit 4C, *Drug Testing Policies and Procedures*, p. 2.

The Drug Testing Procedure further specifies the consequences of drug test violations:

Any employee who fails a drug test; that is, any employee whose drug test is reported as a confirmed positive by the [Medical Review Officer], shall be subject to disciplinary action, up to and including discharge. Any employee refusing to consent to testing, or to submit a saliva, urine, or blood sample for testing when requested by management in accordance with these Policies and Procedures, shall be subject to immediate discharge for violation of Clerk's Office policy. Attempted or actual substitution or adulteration of samples shall be equivalent to refusal to submit to testing, and shall be grounds for immediate discharge, as a violation of Clerk's Office policy. However if in the sole discretion of the Clerk's Office it is decided that sufficient doubt exists respecting the source of adulteration or the fact of substitution of the sample, the Clerk's Office may offer the employee an opportunity without advance notice to provide a new sample in front of a witness of the same gender. If the re-test is negative, then the employee may be allowed to return to work, but will be subject for 60 months thereafter to frequent testing, with witnessed specimen collection, without advance notice.

Gegenheimer Exhibit 4C, *Drug Testing Policies and Procedures*, p. 6.

The policy and procedures statement provides that the Clerk's Office will maintain procedures to provide for the confidentiality of the results of drug and alcohol tests of its employees and applicants, but also provides that the "[r]elease of test results to any other person or agency shall be done only in compliance with applicable law or regulations." *Id.*, p. 7. Thus, the results could be subject to subpoena in criminal or civil matters.

All individuals subject to drug testing would be required to sign a document entitled "Acknowledgement of Receipt of Policy, Consent and Authorization," acknowledging that the use of illicit or excessive use of legal (over-the-counter or prescription) drugs could subject them to discipline, including discharge, and authorizing the Clerk's Office to require them to furnish urine samples for drug testing purposes and saliva samples for alcohol testing purposes. The acknowledgement form states that the employee understands that their refusal to submit to testing "will" result in immediate discharge and further grants permission that the results be disclosed to the Clerk's Office and its physicians and attorneys, "for whatever lawful use the Clerk's Office deems appropriate." Gegenheimer Exhibit 7.

The two major classifications of individuals who shall be subject to random testing include those who hold "safety-sensitive" positions and those who hold "security-sensitive" positions. A memorandum issued by counsel to the Clerk's Office describes the persons who have been classified as holding safety-sensitive or security-sensitive positions. These persons include all personnel in criminal issuing and criminal records, all minute clerks, both civil and criminal, all personnel in the Warehouse, Evidence or Old Records Building, all personnel in the First or Second Parish Courts who handle criminal records, including traffic violations, all juvenile court personnel, all supervisors, including department heads and docket clerks, all personnel involved in the accounting department, all computer personnel who have the access to change monetary data, all counter personnel who handle cash, and any couriers who transport cash, regardless of amount, and mortgage and conveyance certificate clerks. Employees who occupy the described positions number 288 out of 320 total employees.

Not targeted for random testing are the microfilm room employees, the jury pool personnel, and four cancellation clerks who work in the mortgage and conveyance section canceling mortgages. The other employees working in the mortgage and conveyance section were included because the public relies on the accuracy of mortgage

and conveyance certificates and because the Clerk's Office insurance premiums are affected by the performance of certificate clerks. The cancellation clerks were not included because they are closely supervised, but Mr. Gegenheimer readily admitted that the public relies on the accuracy of their work as well.

The decision to include all but approximately 32 of the over 300 employees in the Clerk of Court's office was based upon various considerations. Juvenile Court employees were included because juvenile records are not public records, but are confidential. The civil minute clerks were included because they sit next to criminal minute clerks in the judge's chambers and might have momentary access to evidence introduced at criminal trials. However, Mr. Gegenheimer testified that any drugs admitted into evidence are kept in a Warehouse with only two other employees besides himself having a key and knowledge of its location. There are eight employees, two couriers, two custodians of evidence, and four warehouse workers, who drive vehicles who were determined to be safety sensitive. The remaining employees were determined to be security sensitive.

When asked the primary reason for the institution of the drug testing procedure, Clerk of Court Gegenheimer stated that he wanted his office to set an example as a drug-free workplace. Ms. Marcella Ziifle, a 21 year employee of the Clerk of Court's office who has held the position of In House Counsel for the last three years, testified that during her tenure as a Clerk's office employee, she has heard two reports of drug use. She assisted the Clerk in drafting the drug testing policy and procedure, intentionally defining the areas as broadly as possible so as to include as many employees as legally could be. Ms. Ziifle testified that several employees object to testing some, but not all, of the employees. She said that she had heard some rumors of drug use and that there

was a suggestion in the suggestion box that employees should be prevented from using drugs.

To Mr. Gegenheimer's knowledge, there have been only three instances where the performance of official duties have been compromised by the use of substances. One employee told him that she was entering drug rehabilitation and another employee reported being addicted to prescription medication. There was no testimony that either of these employees breached the confidentiality of or caused any financial detriment to the Clerk's Office. A third employee removed autopsy pictures introduced into evidence at a trial from the courthouse and transported them to a barroom, where she drank alcohol and displayed the photographs while under the influence of alcohol.

The three named plaintiffs in this suit are Phyllis Romaguera, a civil minute clerk, Tammy Gremillon, a criminal records clerk, and Kim Bonano, a counter and coding clerk. A civil minute clerk's duties include swearing in witnesses in and taking down the court's minutes in civil cases. She is assigned to a particular judge and shares and office with the judge's criminal minute clerk in the judge's chambers. She has no access to the vault or to narcotics. She walks down to the Clerk's office several times per day, where she is under the scrutiny of her supervisor and her docket clerk, as well as the many other employees of the Clerk's office.

A criminal record clerk's duties include pulling records for the probation office and opening the criminal mail. All of the records she pulls are public records and microfilmed copies of every document in the record are kept.[1] As a coding and counter clerk, Ms. Bonano handles small amounts of cash, normally $2.00 to $3.00 at a time, with the maximum she's handled being approximately $20.00. She enters the information from checks into the computer sys-

---

1. The Clerk explained that criminal record clerks are considered security sensitive because they have access to records and could tear important documents out of the records. However, criminal records are public; any member of the public has access to both criminal and civil records and has the same opportunity to remove documents from them. This is one reason why all orders and judgments placed in both civil and criminal records are microfilmed.

tem. Her work station is in close proximity to eight other employees, and is next to the docket clerk, her supervisor.

The Clerk cited as a reason for finding all three of these employees "security sensitive" the fact that they have passes which allow them to enter the courthouse building where a large group of the employees work without having to pass through metal detectors. Metal detectors have been set up and are manned by security guards in order to prevent guns and other weapons from being smuggled into the building by members of the public.[2]

The only portion of the testing policy which the plaintiffs seek to enjoin is random drug testing.

## II.

The question presented herein is whether the random drug testing policy and procedure proposed by the Clerk of Court of Jefferson Parish violates the Fourth Amendment of the Constitution of the United States. The Supreme Court has long held that a "compelled intrusio[n] into the body for blood to be analyzed for alcohol content" must be deemed a Fourth Amendment Search." *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989); *Schmerber v. California,* 384 U.S. 757, 767–768, 86 S.Ct. 1826, 1833–1834, 16 L.Ed.2d 908 (1966). The *Skinner* Court left no doubt that the testing of urine is a search under the Fourth Amendment, finding "that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable." 489 U.S. at 617, 109 S.Ct. at 1413.

Keeping in mind that the Fourth Amendment only proscribes unreasonable searches and seizures, the task at hand is to determine what is reasonable, which "depends on all the circumstances surrounding the search or seizure and nature of the search or seizure itself." *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414; *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985). Whether this practice is reasonable "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414.

Fortunately, we are not without guidance in this analysis. The Supreme Court examined the drug testing plan to be implemented by the United States Customs Services in *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 1388, 103 L.Ed.2d 685 (1989). The Commissioner of the Customs Service proposed a plan wherein drug testing was a mandatory condition of employment or placement for the positions that meet one of these criteria:

The first is direct involvement in drug interdiction or enforcement of related laws, an activity the Commissioner deemed fraught with obvious dangers to the mission of the agency and the lives of customs agents. The second criterion is a requirement that the incumbent carry firearms, as the Commissioner concluded that "[p]ublic safety demands that employees who carry deadly arms and are prepared to make instant life or death decisions be drug free." The third criterion is a requirement for the incumbent to handle "classified" material, which the Commissioner determined might fall into the hands of smuggler, is accessible to employees who, by reason of their own illegal drug use, are susceptible to bribery or blackmail.

489 U.S. at 660–661, 109 S.Ct. at 1388 (citations omitted). The proposed program provides that those who qualify for a covered

---

**2.** While of questionable relevance, the Court feels constrained to point out the obvious. There is a much less intrusive method of ensuring the safety of the occupants of the building than requiring the employees to be subjected to mandatory urine testing. As they are in this federal courthouse, all employees could be required to walk through the metal detectors, rather than around them, in order to allow security guards to detect the presence of any weapons. Further, observing that there are approximately 30 employees who walk around the metal detectors and are not subjected to random testing, the Court is not persuaded that this objective is a rationale basis upon which to subject employees to random drug testing.

position must be notified that their final selection is contingent upon successful completion of drug screening. Further, any employee who tests positive for drugs and offers no satisfactory explanation for the test result is subject to dismissal. Finally, "[t]est results may not, however, be turned over to any other agency, including criminal prosecutors, without the employee's written consent." 489 U.S. at 663, 109 S.Ct. at 1389.

After analyzing the program, the Court held that:

> [S]uspicionless testing of employees who apply for promotion to positions directly involving the interdiction of illegal drugs, or to positions which require the incumbent to carry a firearm, is reasonable. The Government's compelling interests in preventing the promotion of drug users to positions where they might endanger the integrity of our Nation's borders or the life of the citizenry outweigh the privacy interests of those who seek promotion to these positions, who enjoy a diminished expectation of privacy by virtue of the special, and obvious, physical and ethical demands of those positions. We do not decide whether testing those who apply for promotion to positions where they would handle "classified" information is reasonable because we find the record inadequate for this purpose.

*Von Raab,* 489 U.S. at 679, 109 S.Ct. at 1397–1398.

In reaching the conclusion that the employees who carry firearms in the course and scope of their employment or who are directly involved in drug interdiction have diminished privacy expectations regarding the governmental intrusion of a urine test, the Court noted "[u]nlike most private citizens or *government employees in general,*" employees who carry firearms and who are involved in drug interdiction should expect inquiry into their fitness as the successful performance of job duties "depends uniquely on their judgment and dexterity." 489 U.S. at 672, 109 S.Ct. at 1394 (emphasis added). The Court found unpersuasive the argument that the testing program was not instituted because of a perception of wide-spread drug usage, since the evidence indicated that there was

no such perception and further, that the program thus far has not uncovered any significant number of drug users. In rejecting such an argument, the Court noted that "[d]etecting drug impairment on the part of employees can be a difficult task, especially where, as here, it is not feasible to subject employees and their work-product *to the kind of day-to-day scrutiny that is the norm in more traditional office environments.*" (emphasis added)

The *Von Raab* Court declined to assess the reasonableness of the testing program relative to employees who are required to handle classified material, agreeing that "the Government has a compelling interest in protecting *truly sensitive information* from those who, 'under compulsion of circumstances or for other reasons, ... might compromise [such] information.'" *Von Raab,* 489 U.S. at 677, 109 S.Ct. at 1396, *quoting Department of the Navy v. Egan,* 484 U.S. 518, 527, 108 S.Ct. 818, 824, 98 L.Ed.2d 918 (1989) (emphasis added). Mandatory drug testing of employees who seek promotions to positions in which job duties required that they handle sensitive information would be permissible, "especially if the positions covered under this category require background investigations, medical examinations, or other intrusions that may be expected to diminish their expectations of privacy in respect of a urinalysis test." 489 U.S. at 697, 109 S.Ct. at 1397. The Court found that there was a genuine issue as to whether the Customs Service defined the category of persons who handle sensitive information more broadly then necessary, since those slated to be tested included accountants, accounting technicians, animal caretakers, attorneys (all), baggage clerks, co-op students (all), electric equipment repairers, mail clerks/assistants, and messengers. In remanding this issue for decision, the lower courts were instructed to consider when assessing the reasonableness of random drug testing of these employees "pertinent information bearing upon the employees' privacy expectations, as well as the supervision to which these employees are already subject." 489 U.S. at 678, 109 S.Ct. at 1397.

Various courts of appeal, our own Fifth Circuit not among them, have grappled with the issue of drug testing programs, using, as we must, *Von Raab* and *Skinner* for guidance. The Seventh Circuit in *Taylor v. O'Grady*, 888 F.2d 1189 (7th Cir. 1989), the Court considered the constitutionality of a systematic drug testing program to be implemented by the Cook County Department of Corrections. Under the proposal all correctional officers and correctional supervisors would be compelled once annually to produce urine specimens for analysis to detect the presence of marijuana, cocaine, and opiates. Any officer who tested positive would be given the option of entering a substance abuse program, or face possible termination at the discretion of the Cook County Police and Corrections Merit Board. If the officer opted for the drug treatment program, he could be subject to mandatory testing twice each month for a period of six months.

The *Taylor* court held that mandatory drug testing of employees who had regular access to the inmate population, reasonable opportunity to smuggle drugs into the inmate population, or access to firearms was constitutionally permissible under the Fourth Amendment. 888 F.2d at 1201. Testing these officers fostered the Department's interests in maintaining an unimpaired, physically fit work force and in preventing the smuggling of drugs to prisoners. The court carefully noted that these interests are not furthered by testing all officers because "egalitarianism has nothing to do with the fourth amendment analysis at issue." *Id.* at 1196–1197. Finding that those officers who are not in contact with prisoners to be indistinguishable from other non-prison governmental employees, the court noted that "[s]ince those officers with only administrative or clerical duties or otherwise lacking contact with the jail population do not threaten claimed dangers if impaired while on duty, and since the record does not show they are able to smuggle drugs to the prisoners, the Department gains nothing by testing them." *Id.* at 1197.

Categorically rejected was the argument that the Department's interest in fostering the public's perception of the integrity of its work force is sufficient to overcome the privacy interests of its employees. Noting that in *Von Raab*, the Supreme Court remanded a segment of the case because the classification of employees who handle sensitive information was drawn too broadly, the *Taylor* decision flatly holds that a generalized interest in ensuring a law-abiding and drug-free work force, while it may make a public statement that no drug users are employed at the Department thereby enhancing public perception of Government, is not enough to outweigh the privacy interests of the affected employees.

The Federal Circuit examined the drug testing plan proposed by the Department of Justice ("DOJ") in *Harmon v. Thornburgh*, 878 F.2d 484 (D.C.Cir.1989), *cert. denied sub nom. Bell v. Thornburgh*, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990). Under the DOJ plan, five categories of employees were designated as occupying "sensitive" positions, subjecting them to random drug testing. These included (1) all present employees currently authorized to have access to top secret classified information; (2) all attorneys who conducted grand jury proceedings and all personnel necessary to assist these attorneys; (3) all current employees serving under Presidential appointments; (4) all current employees whose job duties included the prosecution of criminal cases; and (5) all current employees whose job duties included maintaining, storing or safeguarding a controlled substance. The designated employees will be required to furnish a urine sample at a test site after being notified earlier on the same day of his selection; the sample will be tested for marijuana, cocaine, opiates, amphetamines, and phencyclidine (PCP).

The DOJ argued that the governmental interests of integrity of the work force, public safety, and protection of sensitive information, provides adequate justification for the plan to pass Fourth Amendment muster, suggesting that "its interest in ensuring the integrity of the workforce would justify the random drug testing of every federal employee." 878 F.2d at 489–490.

The *Harmon* court made short work of that argument, finding that although government has a legitimate interest in ensuring that its employees are law-abiding, that interest alone does not outweigh the employee's privacy interests. *Id.* at 490. It found that in order to justify mandatory drug testing, which is a Fourth Amendment search, there must be "a clear, direct nexus ... between the nature of the employee's duty and nature of the feared violation." *Id.*

Recognizing that *Von Raab* authorized the testing of employees who handle "truly sensitive information" and agreeing that whatever its meaning is, it must encompass top secret national security information, the *Harmon* court examined whether the government's interest in preserving its secret could justify the testing of all federal prosecutors or all employees having access to grand jury proceedings, which are not subject to public dissemination. The conclusion reached was that the term "truly sensitive" information "cannot include *all* information which is confidential or closed to public view" because many government employees, including clerks, typists, and messengers, may have some access to the information. Such a distinction does not distinguish these employees from "government employees in general." *Id.* at 492.

In order to rationalize drug testing for public safety reasons, *Harmon* held that there must be an immediate threat such that a single mistake by an employee, i.e., a gun-toting agent or train engineer, could have disastrous consequences. Where the chain of conduct between the slip-up and the injury is more attenuated, such as a blunder by a DOJ lawyer, public safety provides no justification for random drug testing.

Random drug testing of commercial motor vehicle drivers pursuant to Federal Highway Administration of the Department of Transportation regulations and of civilian employees of the Department of the Navy who hold "Top Secret with Access" security clearances was upheld by the Ninth Circuit in two separate decisions. The court in *International Brotherhood of* *Teamsters v. Department of Transportation*, 932 F.2d 1292, 1300 and 1304 (9th Cir.1991) held that the substantial harm that a crash could cause and the need to protect the safety of the travelling public outweighs the diminished privacy expectations of commercial truck drivers who work in an industry which is highly regulated and in which they have long been subject to federal regulation. *Accord Bluestein v. Skinner*, 908 F.2d 451, 456 (9th Cir.1990), *cert. denied* — U.S. ——, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). Finding that "[t]he Navy's random drug testing of civil employees holding [Top Secret Access] clearances directly furthers a compelling interest in protecting the security of our nation by ensuring that employees who come into close proximity to information 'the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to national security' do not use illegal drugs, the court in *AFGE Local 1533 v. Cheney*, 944 F.2d 503 (9th Cir.1991) found such drug testing constitutionally permissible. *Id.* at 508–509. Both of these cases relied on *Harmon*'s analysis regarding public safety and top secret national security rationales for mandatory urine testing.

With these decisions lighting the way, an examination of the Clerk's drug testing policy and procedures must be conducted.

### III.

The only portion of the Clerk's drug testing policy that is being challenged here is random testing. The five other types of testing, pre-employment, post-accident, reasonable suspicion, and return-to-duty, are not under scrutiny here and presumably have been implemented by the Clerk. A balancing of the privacy rights of the individual employees targeted for random testing against the promotion of legitimate governmental interests must be conducted. *See, Skinner*, 489 U.S. at 618, 109 S.Ct. at 1414.

■ The governmental interests which the Clerk advances as justification for the proposed plan are safety and security. The safety sensitive employees include those

who operate motor vehicles, those who have physical custody of drugs introduced as evidence in criminal cases, and access to the evidence room where drugs are stored. Under the jurisprudence, public safety is a valid rationale for imposing random drug testing on employees whose impairment could have immediate and disastrous consequences. *Accord, International Brotherhood of Teamsters,* 932 F.2d at 1300. Thus, the Clerk's governmental interest in ensuring the safety of the travelling public outweighs the privacy interests of those employees who operate motor vehicles in the course and scope of their employment.

■ Other employees who are classified as safety-sensitive include those who have physical custody of drugs and those who have access to it. Those who have physical custody of illicit drugs which is evidence in court proceedings include the Clerk, who has the key to the Warehouse, and two other personnel who have the key to the evidence room as well as knowledge of the location of the warehouse. The Clerk testified that only these personnel have evidence room keys. Further, the location of the warehouse is confidential and is changed periodically. The interest of the clerk in ensuring that these employees, who have direct and unsupervised access to drugs, are drug-free, is sufficient to overcome their privacy interests, since there is a clear, direct nexus between the nature of the employee's duty, i.e., to safeguard illegal drugs which have been admitted into evidence in criminal trials, and the nature of the feared violation, i.e., that the employee will divert the drugs to his or her own personal use, or will come under the influence of drug dealers or traffickers, who would like to see such critical evidence disappear. Random drug testing of these employees is allowable.

■ The category of employees defined as those who potentially have "access" to drugs is more troublesome. The job categories which fall under this heading are criminal minute clerks, civil minute clerks, and all personnel in criminal records and criminal issues, because "it is sometimes necessary for them to take records into the courtrooms where criminal evidence can be accessed." Gegenheimer Exhibit 11. The difficulty with the term "access" is that while the drugs might be physically present in the courtroom during the trial, at no time is it left in these employee's unsupervised possession. During a trial, while some Clerk's office personnel are present, there are numerous other persons who are physically present in the courtroom, i.e., the judge, the witnesses, the lawyers, the litigants, spectators, and security personnel. Certainly, there is adequate supervision of the drugs while they are physically present in the courtroom so as to the make feared harm, that civil and criminal minute clerks and criminal records and criminal issuing clerks will remove the evidence from the courtroom in plain view of all other persons present, so improbable and remote as to be absurd. The Court cannot find that this governmental interest to be adequate justification for random drug testing of these employees.

■ A second classification of employees who shall be subject to random drug testing by the Clerk are those who are considered security-sensitive. Included in this group are personnel in criminal records and criminal issuing, because they have immediate access to criminal records and the ability to alter those records, civil and criminal minute clerks, all persons working in the warehouse or evidence storage facility, because of proximity to stored evidence, personnel in the old records building because there are old Juvenile Court records stored there which are confidential, all personnel in First or Second Parish Courts who handle criminal records, including traffic violations, because they have access to criminal records, which could be altered, all Juvenile Court records, which are confidential, all supervisors, because they have the authority to demand drug testing of the employees they supervise and because they should be subject to testing if the employees they supervise are subject, all personnel in the accounting department because they have the ability to divert funds to themselves or accomplices, all computer

personnel who have access to change monetary data, all counter personnel who handle any sum of cash, and any courier who transports cash in any sum.

The Court has previously considered the interest advanced for testing employees who have possible "access" to evidence in court proceedings.[3] The "access" discussed is purely proximity to the courtroom where documents and item, including drugs at time, have been admitted into evidence. The record reflects that these persons have no unsupervised access to this evidence and the minute possibility that they could tamper or take it is not an adequate basis upon which to allow random testing. Supervision is an important criteria to evaluate in determining whether testing is reasonable. *Von Raab*, 489 U.S. at 679, 109 S.Ct. at 1397.

■ The government's interest in preserving the confidentiality of routinely kept records not bearing upon national security is also insufficient to overcome the employees' privacy interests. As held in *Harmon*, "truly sensitive" information does not include all information which is confidential or closed to public view, as all government employees have knowledge of information which must be kept confidential. 878 F.2d at 492. Also lacking is the Clerk's proffered reason for testing all supervisors, i.e., that if the employees they supervise are subject to testing, they should be also. The *Taylor* court plainly held that "egalitarianism has nothing to do with the fourth amendment analysis at issue." 888 F.2d at 1196–1197.

■ The Clerk proposes to randomly test all employees who handle cash in any amount, all computer personnel who have access to change information in the computer, and all personnel in accounting because they have the ability to divert funds to themselves or others. Illustrative of the type of employee who handles some cash is a counter clerk, whose desk is situated in plain view of several other employees, who handles small amounts of cash, rarely in excess of $20.00 per transaction or $200.00 per day, in the course of her job, and who is closely supervised. The rationale offered for random drug testing of this type of employee, that they might take some of the money, cannot be adequate governmental justification for a fourth amendment search. These employees are subject to strict supervision and the harm perceived, that they might steal some money, considering the small amount in their care and the probability that their actions would be discovered very quickly, is not the type of security risk envisioned in the jurisprudence as a reasonable basis for testing.

■ Also difficult to justify is the random testing of all computer personnel who enter information in the computer, all accounting personnel, and mortgage and conveyance clerks. Detecting drug impairment and the work related consequences thereof in these employees who work in a traditional office environment and who are subject to the day-to-day scrutiny of their supervisors and fellow employees requires no different measures than that of other government offices in general. While these employees are in a position to make mistakes, they are supervised well and subject to quality controls. The Court finds, as the Supreme Court did in *Von Raab*, that this group of employees has been drawn too broadly. If in fact there are some employees who have unsupervised access to Clerk's office funds such that they could embezzle significant sums of money without detection, perhaps the interest of preventing such embezzlement by a drug-user might be sufficient. However, the evidence in this record does not support the Clerk's argument that these employees have that type of ready access.

Underlying the Clerk's drug testing policy of all of these employees is his desire for his office to set an example as a drug-

---

**3.** This category does not include the two couriers, two custodians of evidence who have keys to the evidence room, the Clerk, and the four warehouse workers who drive vehicles, who have been designated safety-sensitive. The Court has found that the governmental interest in ensuring the safety of the travelling public and in preventing the smuggling of drugs sufficient to overcome their privacy interests.

free workplace. This is admirable, but, as noted by Justice Scalia in his *Von Raab* dissent, not a valid basis to uphold his proposal. His eloquent reply to such an argument is this:

> What better way to show that the Government is serious about its 'war on drugs' than to subject its employees on the front line of that war to this invasion of their privacy and affront to their dignity? To be sure, there is only a slight chance that it will prevent some serious public harm resulting from Service employee drug use, but it will show to the world that the Service is 'clean,' and—most important of all—will demonstrate the determination of the Government to eliminate this scourge of our society! I think it obvious that this justification is unacceptable; that the impairment of individual liberties cannot be the means of making a point; that symbolism, even symbolism for so worthy a cause as the abolition of unlawful drugs, cannot validate an otherwise unreasonable search....

489 U.S. at 686–687, 109 S.Ct. at 1401.

### IV.

While there are only three plaintiffs in this case and the question of class certification was not reached, the Court considered the reasonableness of random drug testing as to all targeted employees. Accordingly, the injunction sought against random drug testing will be denied as to the eight employees, who are determined to be safety sensitive, these being two couriers, two custodians of evidence, and four warehouse workers, as well as the Clerk, as he has a key to the evidence room. As to all three plaintiffs, and all other employees whose positions are specifically discussed herein, the injunction shall be granted. The Clerk may choose to define more specifically the category of employees who have unsupervised access to accounting records such that they could divert funds, but at the present time, the category is more broadly defined that necessary. All other components of the Clerk's drug testing policies and procedures were not at issue here, and thus no injunction shall apply thereto.

### V.

The plaintiffs further challenge the constitutionality of LSA–R.S. 49:1015, which provides in pertinent part that a public employer may require, as a condition of continued employment, drug testing post-accident, pre-employment, for monitoring purposes when there is a return-to-duty following drug rehabilitation, and randomly for those who occupy safety-sensitive or security-sensitive positions. Since the statute does not define these terms, leaving that to the jurisprudence, and the focus of plaintiff's case was the manner in which the Clerk of Court attempted to define the terms, the Court finds that the consitutionality challenge to be unnecessary and thus that issue will not be reached.

Judgment shall be entered in accordance herewith.

The plaintiffs have requested attorney's fees under 42 U.S.C. § 1988. This shall be addressed at a separate hearing.

### ORDER AND JUDGMENT

Considering the record, the evidence adduced at the injunction hearing, the Order and Reasons entered by the Court this date, and the law, there being no just reason for delay and the Court directing that judgment be entered, for the reasons assigned,

IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiffs Phyllis Romaguera, Kim Bonano, and Tammy Gremillon, and against defendant Jon Gegenheimer, Clerk of Court, 24th Judicial District Court, ex officio Recorder of Mortgages and Conveyances, Parish of Jefferson, with costs, as follows:

1) The Clerk of Court of Jefferson Parish is hereby enjoined from enforcing and implementing the random drug testing as outlined in Drug Testing Policies and Procedures as to named plaintiffs Phyllis Romaguera, Kim Bonano, and Tammy Gremillon, and as to all personnel in Criminal Records and Criminal Issuing, all minute clerks, both civil and criminal, all personnel

in the old Records Building, all First Parish Court and Second Parish Court personnel, all Juvenile Court personnel, all supervisors, department heads, and docket clerks, all accounting department personnel, all computer personnel, all counter personnel, mortgage and conveyance clerks, and any courier who does not drive a motor vehicle, provided however, that should any employee fall within a category outlined herein in section 2), random drug testing shall be allowed;

2) The Clerk of Court of Jefferson Parish is not enjoined from implementing random drug testing as outlined in his Drug Testing Policies and Procedures as to the Clerk, warehouse personnel who drive motor vehicles, custodians of the evidence room, and couriers who drive motor vehicles;

3) The Clerk of Court of Jefferson Parish is not enjoined from implementing pre-employment testing, post-accident testing, reasonable suspicion testing, and return-to-duty testing, as outlined in his Drug Testing Policies and Procedures.

IT IS FURTHER ORDERED that there be judgment herein DISMISSING plaintiffs' claims against the Honorable Edwin Edwards, Governor of the State of Louisiana, WITHOUT PREJUDICE.