Adam J. MOULÉ, a minor, By and Through his parents, James A. MOULÉ and Kathleen A. Moulé, husband and wife, Plaintiff,

v.

PARADISE VALLEY UNIFIED SCHOOL DISTRICT NO. 69, a political subdivision of the State of Arizona, and Paradise Valley Unified School District No. 69 Governing Board, Defendants.

No. CIV 93–2190 PHX PGR.

United States District Court,
D. Arizona.

Sept. 9, 1994.

mitigating evidence does not outweigh the evidence in aggravation.

Daniel D. Maynard, Michael Dean Curran, Phoenix, AZ, for plaintiff.

Gary L. Lassen, Robert D. Haws, Phoenix, AZ, for defendants.

## MEMORANDUM AND ORDER

ROSENBLATT, District Judge.

### BACKGROUND

#### A. Procedural Background

At the time of the filing of the Complaint in this action, Adam J. Moulé ("Adam") attended Horizon High School,[1] a high school within the Paradise Valley School District (the "School District") in Arizona. Since Adam is a minor, the action was brought by Plaintiff through his parents, James A. Moulé and Kathleen A. Moulé.

Adam is challenging the School District's random drug testing program. He seeks a declaration that the program and the procedures implemented thereunder violate his rights under the United States Constitution and the Constitution of the State of Arizona, and asks the Court to enjoin further implementation, administration or execution of the program.

The Court set Plaintiff's motion for preliminary injunction for hearing in February 1994. At the parties' request, they were allowed to conduct a trial on the merits and thereafter submit post-hearing memoranda and proposed findings and conclusions. Subsequent to the trial, the Ninth Circuit Court of Appeals issued an opinion directly bearing upon the issues before this Court. The Ninth Circuit having denied rehearing on the case before it, this Court is free to address those issues.

---

1. It is the Court's understanding that Adam was a junior at the time of the filing of the Complaint and will be returning as a senior for years 1994–1995.

### B. *Factual Background*

In the 1980s, officials of the School District and members of the District's governing board ("Governing Board") became concerned about perceived drug use among students in schools within the School District.[2] In response, they implemented a "self-esteem" program to help students to "say no to drugs." (Deposition and Trial Testimony of Vicki L. Canen.) Although the program did not include drug testing, . . . . it appeared quite effective by the end of the 1980s. (Trial Testimony of Vicki Canen.)

School officials nevertheless became further concerned about drug usage within the School District. This concern was aroused by various athletic coaches' perception of increased steroid use among students.[3] In the fall of 1989, the School District began gathering data and input from parents, student athletes, coaches and community members addressing the need for, and implementation of, a program for random drug testing of student athletes. (Joint Stipulated Statement of Facts, filed February 25, 1994, pp. 2–3.) The District and its Governing Board engaged in a lengthy analysis.

School District officials and Governing Board members were not aware of any injuries received by athletes as a result of drug or alcohol use, and were not aware of any evidence that athletes were more likely than other students to use such substances. (Testimony of John A. Stollar, Jr.; Testimony of Vicki Canen.) Nevertheless, in 1990 the Governing Board voted unanimously to adopt a program for the random testing of student athletes. (*Id.*)

In 1991, the School District began its random drug testing program. Under that program, students desiring to participate in interscholastic sports within the School District must meet academic, eligibility, age, residency and health requirements set by the Arizona Interscholastic Association and the School District; attend an orientation with their parents; sign a consent form; and submit to random testing involving the obtaining and testing of urine samples. (Stipulated Facts, p. 4.) Interscholastic sports are extracurricular programs at the School District; participation is voluntary and student athletes do not receive academic credit for participating. Students refusing to submit to random drug testing are not allowed to participate in interscholastic sports. Other students within the School District are not subjected to random testing. (*Id.*)

Student athletes are chosen for individual testing at random. If chosen, the athlete is escorted from class by a security guard and conducted to a bathroom within an office. He or she provides a urine sample in private, without direct observation. Various steps are taken to ensure the sample's integrity, to protect the chain of possession, and to protect the identity of the athlete, before and after the sample is turned over to a laboratory for drug testing by urinalysis. (Stip. Facts, pp. 4–5.) The tests screen for the presence or absence of alcohol, amphetamines, barbiturates, benzodiazepines, cocaine, methadone, methaqualone, opiates, phencyclidine, propoxyphene, cannabinoids, and anabolic steroids. (Stip. Facts, p. 6.) Drug screenings using confirmatory tests are approximately 99.9% reliable. (*Id.* at p. 5.)

If a test is positive, the student athlete and the athlete's parents are informed. An athlete who believes the result is a false positive may have the sample retested or may provide a sufficient explanation for the result. (Stip. Facts, p. 5.) A "true positive" will result in temporary athletic ineligibility, which may be reduced by attending counseling. No further disciplinary action is taken.

**2.** While Defendants' witnesses testified that there was an increase in drug use, it appears they primarily relied upon survey results for their conclusions. They presented no evidence of specific instances of drug use prior to 1988–89.

**3.** Coaches Doug Shaffer and Eric Kibler testified that they detected tell-tale signs of steroid use by several students. The coaches reported their concerns to Principal John A. Stollar, Jr. (Deposition and Trial Testimony of Doug Shaffer and Eric Kibler.) There is significant evidence that, "[b]asically that's the way the ball started." (Depo. of Shaffer, pp. 6–7.) The students suspected of steroid use were not tested at that time. As to the use of any other drugs, Defendants relied on various surveys which were likely unreliable. (*See* Testimony of Bruce Henderson.) Defendants presented no significant evidence concerning the use of other drugs.

(*Id.* at 5–6.) From inception of the random drug testing program to December 1, 1993, no more than three student athletes have tested positive; those students tested positive for cannabinoids. Although one student voluntarily sought help for steroid use, the tests have not resulted in any positives for steroids. (Stip. Facts, pp. 7.)

Adam Moulé has been tested twice and has received negative results both times. He is an exemplary student; in addition to being an avid participant in sports activities, he participates in band and several clubs, is a member of the National Honor Society, and has a class ranking of 19 out of 631. (Testimony of Adam Moulé; Testimony of John Stollar.)

Adam Moulé and James Moulé concede that they attended the drug testing orientation and signed consent forms on at least two occasions. (Testimony of James Moulé.) Moreover, Adam Moulé voluntarily participated on the Horizon High School cross country team in August through November of 1991, 1992 and 1993, and participated on the Horizon track team in January through May of 1992 and 1993. (Stip. Facts, pp. 1–2.) James Moulé testified, however, that he did not sign the forms voluntarily; sports are very important to his son, and he felt it was not proper to deprive Adam of his right to participate. (Testimony of James Moulé.) Mr. Moulé voiced his objections by speaking with school officials, indicating on the consent form that he was being forced to sign and did so under protest, and by seeking counsel to challenge the constitutionality of the School District policy. (*Id.*)

*DISCUSSION*

Adam Moulé submits that the School District's random drug testing program and the procedures used to administer the program constitute an unreasonable search and an illegal invasion of his privacy, in violation of his constitutional rights under the Fourth Amendment to the United States Constitution and Article 2, Section 8 of the Arizona Constitution.

### A. *Jurisdiction*

Defendants Paradise Valley School District No. 69 and the Paradise Valley School District No. 69 Governing Board are organized and existing under Arizona law and are governmental entities. (Stip. Facts, p. 2.) This Court has jurisdiction over Plaintiff's Fourth Amendment claim. 28 U.S.C. § 1331; 42 U.S.C. § 1983; *Acton v. Vernonia School Dist. 47J*, 23 F.3d 1514, 1517 (9th Cir.1994), *reh'g. denied* (July 8, 1994). It has supplemental jurisdiction over the Arizona constitutional cause of action. 28 U.S.C. § 1367(a); *Acton*, 23 F.3d at 1517.

### B. *Evidentiary and Constitutional Analysis*

Plaintiff alleges that Defendants violated both federal and state constitutional provisions. This action bears unmistakable similarities to a recent Ninth Circuit case, *Acton v. Vernonia School Dist. 47J*, 23 F.3d 1514 (9th Cir.1994), *reh'g. denied* (1994). In that case, an Oregon high school student athlete's parents challenged, on the student's behalf, the constitutionality of a school district's imposition of random drug testing of student athletes. The Court will largely employ the analytic process set forth in *Acton*.

In lawsuits asserting violations of federal and state constitutions, a federal court must determine whether the state and federal constitutional provisions are "coextensive." If they are, the court may address the federal constitutional claims, as resolution of those claims necessarily will decide the state constitutional claims. *Acton*, 23 F.3d at 1518 (citation omitted). If the state and federal provisions are not coextensive, however, and the state constitution affords more protection than the federal constitution, the court decides validity under the state constitution "in order to avoid addressing federal constitutional claims unnecessarily." *Id.* at at 1518 (citation omitted).

The Arizona Constitution, in Article 2, Section 8, provides:

> No person shall be disturbed in his private affairs, or his home invaded, without authority of law.

ARIZ. CONST., Art. 2, § 8.

The Fourth Amendment to the United States Constitution and Article 2, § 8

of the Arizona Constitution prohibit unreasonable search and seizure by government authorities. *State v. Ault*, 150 Ariz. 459, 724 P.2d 545, 549 (1986). In fact, Arizona's privacy provision is broader than the Fourth Amendment. *Id.*[4] This Court must first attempt to decide the validity of the School District's drug testing program under Arizona's Constitution. That is not an easy task, as Arizona courts have never decided a random drug testing case. Where state law is silent, the court may refer to federal Fourth Amendment law for assistance. *See Acton*, 23 F.3d at 1518, 1520.

■ Drug testing conducted through the collection and testing of urine samples by state officials constitutes a search. *Acton* at 1520, citing *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989). *See also Intern. Broth. of Teamsters v. Dept. of Transp.*, 932 F.2d 1292, 1299 (9th Cir.1991).

■ The *Acton* court characterized the random drug testing of minor students pursuant to a school policy as an "administrative" search, rather than a "criminal" search. *See Acton*, 23 F.3d at 1521. Under Arizona law, warrantless administrative searches are sometimes permitted if there is a regulatory scheme specifically authorizing such searches, an important governmental interest is involved, and the search is reasonable. *See Mendez v. Arizona State Bd. of Pharm.*, 129 Ariz. 89, 91, 628 P.2d 972, 974 (App.1981); *State of Ariz. v. Hone*, 177 Ariz. 213, 866 P.2d 881, 882–884 (App.1993).

It appears that the School District policy was properly enacted and authorizes school officials to conduct the random searches. *See Acton*, 23 F.3d at 1520, 1521. The Court must therefore determine whether the random and suspicionless searches at issue are "reasonable." *Id.*

■ Arizona courts have employed a Fourth Amendment analysis in administrative search cases. *See Hone*, 866 P.2d at 885–886. The Fourth Amendment requires the balancing of the governmental interest against the privacy interests involved. *Id.; Acton*, 23 F.3d at 1523, citing *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989); *Portillo v. United States District Court of Arizona*, 15 F.3d 819, 823 (9th Cir. 1994).

■ There is no question that "the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable...." *Skinner*, 489 U.S. at 617, 109 S.Ct. at 1413. In rare instances, courts have found these expectations diminished. *See Skinner*, 489 U.S. at 627–28, 109 S.Ct. at 1418–19 (railroad employees' expectations diminished by long-term regulatory activity and necessity for safety); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (because of their use of firearms and handling of classified material, certain customs officers should expect inquiry into fitness and probity); *Intern. Broth. of Teamsters v. Dept. of Transp.*, 932 F.2d 1292 (9th Cir.1991) (truckdrivers' privacy expectations diminished due to comprehensive and long-term safety and other regulation). These "rare instances" have been limited to "cases fraught with danger where the interests of the person to be tested were attenuated." *Acton*, 23 F.3d at 1524–25.

This is not a case "fraught with danger" involving persons with attenuated interests in privacy. The Ninth Circuit has found that students and student athletes are not subject to the sort of extensive government regulation that would attenuate their privacy interests, and their lives or the lives of others generally do not depend upon their ability to perform their roles as athletes. Their rights to privacy in their excretory functions are undiminished. *Id.* at 1525. *See also Brooks v. East Chambers Consol. Ind. School Dist.*, 730 F.Supp. 759, 766 (S.D.Tex.1989), *aff'd*

---

**4.** The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*without pub. op.,* 930 F.2d 915 (5th Cir.1991) (student athletes do not have diminished expectation of privacy); *Portillo,* 15 F.3d at 824 (even a parolee has an expectation of privacy).

Defendants have not presented any evidence that Adam's privacy interests are attenuated not rejected in *Acton.* It appears that he is entitled to the same protection afforded to the student athletes of the Vernonia School District, the district involved in the *Acton* case.

As for the government's interest, the School District has worthy goals similar to those of the Vernonia School District. The Paradise Valley School Board is attempting to prevent unnecessary athletic injuries, to reduce the attraction of drugs, to discourage the use of potentially-dangerous steroids, and to assist students who are reluctant to use drugs, but feel pressured to use them.[5] The gravity of the dangers the Board seeks to dispel, however, is not of the magnitude required to permit suspicionless testing. *Acton,* 23 F.3d at 1526.

#### C. Consent

■ Defendants argue that, even if their drug testing program does not withstand constitutional scrutiny, there is no constitutional violation because Adam and his father, by signing the consent forms given to them, voluntarily consented to the testing. The Defendants have the burden of proving that consent to the search was voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). Voluntariness is a question of fact. *Id.* at 248–49, 93 S.Ct. at 2058–59.

■ Participation in extracurricular, school-sponsored athletics within the School District is, at this time, conditioned upon submission to the District's drug testing program. James Moulé testified that he signed

the consent forms because athletic participation is very important to Adam and he did not wish to deny Adam the opportunity to participate. Both James and Adam Moulé testified that they did not voluntarily sign the consent forms. The forms themselves demonstrate that the Moulés objected to random, suspicionless drug testing from the outset, and agreed to submit to testing in order to allow Adam to participate.[6]

Viewing the totality of the circumstances of this case, the Court must conclude that the consents obtained from the Moulés under the School District's "no testing, no playing" requirement were not truly voluntary. *See Acton* at 1526–27. Adam and his father were "coerced" for constitutional purposes by the fact that Adam was barred from participation without a signed consent. *University of Colorado v. Derdeyn,* 863 P.2d 929, 959–950 (Colo.1993), *reh'g denied* — U.S. —, 114 S.Ct. 2729, 129 L.Ed.2d 852 (1994). Defendants have failed to meet their burden of demonstrating otherwise.

#### CONCLUSION

The Ninth Circuit Court of Appeals has determined that a school district's policy of random drug testing of high school athletes violates the Fourth Amendment of the United States Constitution. *Acton,* 23 F.3d at 1526. This Court is unable to find any significant factual differences distinguishing Adam Moule's circumstances from those presented in the *Acton* case, and will follow Ninth Circuit precedent. Because the policy violates the United States Constitution, it follows that it violates Article 2, § 8 of the Arizona Constitution. Moreover, Adam and his parents did not voluntarily consent to random, suspicionless drug testing.

In accordance with the foregoing,

IT IS HEREBY ORDERED granting the Plaintiff's Request for Preliminary Injunction (Doc. 2–2) and granting his request for the

---

5. Although the School District coaches testified as to their *suspicions* that their students were using steroids, Defendants did not present any direct evidence of usage. The District did not conduct tests of the students under suspicion.

6. In *Derdeyn,* 863 P.2d at 949, the Colorado Supreme Court pointed out that the college students objecting to random testing may not have had a meaningful opportunity to apply for admission to another educational institution after learning about the college's drug testing program. As a high school student, Adam likely had even less choice.

entry of a permanent injunction in this matter.

IT IS FURTHER ORDERED that Plaintiff shall, within ten days from the filing of this Order, prepare and submit a form of Judgment for the Court's review and signature.